OF

# THE STATE OF NEW JERSEY.

## 1915.

EDWIN ROBERT WALKER, ORDINARY.

JOHN R. EMERY, FREDERIC W. STEVENS, EUGENE STEVENSON, EDMUND B. LEAMING, JAMES E. HOWELL, VIVIAN M. LEWIS, JOHN H. BACKES AND JOHN GRIFFIN, VICE-ORDINARIES.

LILLIAN R. SHOTWELL, appellant,

*v.*

LAURA H. SHOTWELL, respondent.

[Decided May 5th, 1915.]

1. Upon appeal from the decree of the orphans court, reversing that of a surrogate admitting a will to probate, the original jurisdiction of the prerogative court is invoked, and the question to be decided is whether the paper-writing should be admitted to probate, not whether there was error below.

2. One claiming the invalidity of an alleged will on the ground of undue influence or fraud in probate proceedings has the burden to establish the fact.

3. While a testator may make an inofficious will, which cannot be set aside because court or jury may consider it contrary to sentiments of natural affection or duty, nevertheless its character is evidence bearing upon the question of undue influence.

4. In proceedings to probate a will, evidence *Held* insufficient to establish undue influence exerted by an elder daughter.

5. Where, on appeal to the orphans court from probate of a will by the surrogate, a decree denying its validity, which was exhibited to counsel for the proponent, awarded the contestant costs, she not objecting thereto, and making no move to prevent the decree from being carried out and the checks of the administrator *pendente lite* from being paid out of the funds of the estate as provided in the decree, on appeal to the prerogative court from such decree of the orphans court it being reversed, application of proponent's counsel for a counsel fee and costs will be denied.

On appeal from the decree of the Sussex county orphans court, entered upon the verdict of a jury, adjudicating that the paper purporting to be the last will and testament of Emma Shotwell, deceased, was the result of undue influence, imposition and fraud, and was not the last will and testament of said Emma Shotwell.

*Mr. Henry W. Runyon,* for the appellant.

*Mr. Edward L. Price,* for the respondent.

STEVENSON, VICE-ORDINARY.

Common proof was made of the paper-writing in question before the surrogate of Sussex county, and the same was admitted to probate as the will of Emma Shotwell, deceased. The respondent, Laura H. Shotwell, thereupon appealed to the orphans court and obtained from that court under the statute an order sending the cause for trial to the Sussex circuit court upon questions stated. The respondent attacked the will upon three grounds, viz., inadequate execution of the instrument, testamentary incapacity of Emma Shotwell, the testatrix, and undue influence, imposition or fraud practiced by the appellant in this court, Lillian R. Shotwell. The evidence established the proper

execution of the will as required by the law of New Jersey, and further established that the testatrix was of sound and disposing mind, and the verdict or deliverance of the jury was so made in accordance with the direction of Mr. Justice Black, who tried the case. The jury, however, decided against the will on the ground that it was "the result of undue influence, imposition or fraud upon the said Emma Shotwell, deceased, by Lillian R. Shotwell, sole beneficiary under said alleged will," and the decree of the Sussex county orphans court, being necessarily based upon and in accord with the finding of the jury, reversed the decree of the surrogate admitting the will to probate and ordered that the letters testamentary issued thereon be revoked.

This decree of the Sussex orphans court is the subject-matter of the appeal to this court, and it is well settled that on such appeal the original jurisdiction of the court is invoked, and the matter to be decided is not whether any error was committed by the court or jury below, but whether this paper-writing should be admitted to probate as the decedent's last will and testament. *Sanderson* v. *Sanderson, 52 N. J. Eq. 244, 245; Rusling* v. *Rusling, 36 N. J. Eq. 603; Kayhart* v. *Whitehead, 77 N. J. Eq. 12.*

In the exercise of the power of the court to take additional testimony, a letter of comparatively little importance was put in evidence, but with this exception, both sides apparently elected to try, and in fact did try, the case before this court upon the evidence which had been taken at jury trial in the Sussex circuit court.

The evidence, in my judgment, does not warrant the inference that the will in question was the "result of undue influence, imposition or fraud upon the said Emma Shotwell, deceased, by Lillie R. Shotwell."

Of course, at the start the burden is upon the respondent to establish the fact of undue influence or fraud. The will was drawn by a lawyer, in the city of New York, who was a stranger to the decedent and her daughter Lillian. All the details necessary for the legal execution of the instrument were accurately attended to. If we base the strongest possible presumption upon the fact that at the time the will was made the decedent was

residing with her daughter Lillian, the sole beneficiary named in the will, I think that the evidence more than overcomes any such presumption, unless in all cases where a parent resides with a son or daughter the parent's will in favor of such son or daughter must be set aside unless the beneficiary can establish an almost impossible negative by other evidence than his or her own oath. In this case the appellant positively denies under oath that she influenced or persuaded her mother, or had anything to do with making the will, and there is no evidence which contradicts her.

The evidence having been taken before a jury is not as ample and satisfactory as it probably would have been if it had been taken in a more leisurely manner and with opportunity on the part of counsel to supply omissions.

I shall not undertake in this memorandum to make an elaborate discussion of the evidence bearing upon this question of undue influence. It may be noted here that while the word "fraud" is employed in the record, no kind of fraud in respect of this will has been suggested except that species of fraud which is technically known as undue influence.

The will in question was executed by the testatrix, Emma Shotwell, a woman sixty-nine years of age, on December 11th, 1912, and the testatrix died on February 14th, 1913. The testatrix was a farmer's wife, her husband being seventy-four years of age. Besides the appellant's husband, James K. Shotwell, the family consisted of two daughters, Lillian and Laura, who are the parties litigant before this court. The ages of these women are not disclosed, but I think it may be safely inferred that there is not a great difference in respect of age between them, the appellant, Lillian, being the elder, and that they are both at least approaching middle life. The farm is situate in Sussex county, and while its value was not proved, the indications are that it is not very productive or very valuable, and that this small family secured from it a somewhat meagre support.

Until the spring of 1912 the testatrix appears to have been to a large extent the manager of the business of the farm. She owned the farm in fee and also owned the stock upon it, and the furniture in the house, I think, as well. No evidence was offered

to show the value of this personal property, but it is safe to infer that such value was not a very considerable sum of money.

The appellant had devoted a number of the best years of her life to assisting her parents without compensation, and in doing so had even worked at a man's labor upon the farm. The younger daughter formerly seems to have suffered from ill health during which period she submitted to various surgical operations. With assistance from a friend, and with substantial pecuniary assistance from her mother and her sister, Lillian, Laura was able to obtain a medical education in various medical colleges in the country, finally ending with a diploma from a medical school in Chicago, upon which she began to practice medicine in that city in the year 1911.

While Mrs. Shotwell, of course, had a right to make an inofficious will, and such will could not lawfully be set aside because a jury or a court might consider it contrary to sentiments of natural affection, and contrary to duty, nevertheless, the fact that a will is inofficious is to be taken into consideration as evidence bearing upon the question of undue influence. I am unable to find sufficient evidence in this case to justify the belief that this will as it stands to-day is not in fact a just disposition of property. If the farm had been worth $25,000, with $5,000 worth of stock upon it, the case would be entirely different. I incline to think that most right-minded persons, after perusing the undisputed testimony in regard to the services rendered by the elder daughter to her parents and her sister, and in regard to the advantages which the younger sister has through many years received from her parents and her sister, while she contributed nothing to them, would adjudge that the younger sister, Laura, with her superior education and her established practice of a profession in which she began in a year or two to earn enough money to enable her to make small contributions to her family, has a far better start in life than her illiterate sister with this Sussex county farm subject to her father's right of courtesy, and with the moral obligation which she recognizes upon her to take her mother's place and care for this old man whose days of efficient labor must be about over.

In the summer of 1912 the testatrix had a severe illness, but the evidence, I think, showed beyond all doubt that so far as her mental faculties were concerned she made practically a complete recovery.  Her health, however, remained infirm.  The older daughter, Lillian, was living in North Arlington, Essex county, carrying on some little business; the younger daughter, Laura, was practicing her profession in Chicago.  The old lady could not stand the hard work of the farm and her husband had in some way occupied himself with putting crops in another farm.  The exact conditions in the testatrix's home are not fully disclosed, but it appears that the mother went to her daughter Lillian's house about August, 1912, where she remained until her death, during which period she made occasional visits to her Sussex county home.  Lillian testifies that her mother said:

"She did not want to be left alone on the farm, and father had been attending to the crops of Mr. Rosenkranz's place, and she said to hire a working girl she could not do it; the farm would not bear the expense of a working girl, and she was not going to stay there alone and look after things."

According to the testimony of Lillian her mother, whom she describes as a "very independent woman" (and no witness expresses a contrary opinion), declared her intention to have a will made by a lawyer and desired her daughter to go to a lawyer with her.  The daughter Lillian had occasionally done business with a man named Burr, not a lawyer, but a collector, who had an office with a firm of lawyers in New York City.  The mother seems to have thought that Mr. Burr could properly draw her will and do it "more reasonable and cheaper than others."  The weakness and infirm health of the mother made it natural and proper that her daughter Lillian should accompany her to New York.  The two women called upon Mr. Burr and he had a brief interview with them in the room of Judge Warren, the head of the firm.  After learning Mrs. Shotwell's errand, Mr. Burr called in Mr. Cacciola, an attorney-at-law, or law clerk, and thereupon this legal gentleman took charge of the business.  The daughter left the room and was absent while Mr. Cacciola was

engaged in taking his instructions from Mrs. Shotwell, drawing the will and having the same executed. Lillian says that during this period, while the will was being prepared and executed, she went out upon a matter of business of her own. Mr. Cacciola testifies that he had never seen Mrs. Shotwell until she came to his office to have her will drawn, and Lillian testifies that she had never had any business transactions with this legal gentleman whom she calls Mr. Cashell. The evidence indicates that Lillian's business with Judge Warren's office or acquaintance with any person there employed was confined to Mr. Burr, this collector. If Lillian had practiced undue influence upon her mother and thereby induced her to go through a form of making a will in her (Lillian's) favor, she might naturally have taken her mother to Mr. Burr, whom she had employed to do business for her, and with whom she might have had some private prearrangements in regard to her mother's will, but it hardly seems probable that Lillian, after seeing a strange lawyer called in and put in charge of the business of making her mother's will, would have gone away on her own business leaving her mother to instruct her new legal adviser and be advised by him, and leaving the will to be drawn, executed and put in a lawyer's safe all in her absence.

There is not a particle of evidence in this case, in my opinion, to warrant the belief that Mrs. Shotwell in giving instructions to this strange New York lawyer, or law clerk, from which he forthwith drew this will, disposing of this Sussex county farm and its equipment, was not expressing testamentary purposes which originated in her own mind unaided and uninfluenced by her daughter Lillian or any other person.

A very important test of the actual condition of Mrs. Shotwell's mind in respect of the formation of independent plans and purposes and carrying the same into effect, is presented by the testimony of the husband and father, James K. Shotwell, who is sworn as a witness in this cause on behalf of his daughter Laura, the respondent.

It appears that about the 1st of October, as the result of Mrs. Shotwell's efforts, an insurance policy upon the life of the husband, but in favor of the wife, was converted into cash. The

policy was sold, or the surrender value was paid. Mr. Shotwell, about the 1st of October, 1912, had received a check for this money ($2,250), payable to himself and his wife, and had kept it in his possession. Mrs. Shotwell, plainly the better manager of the two, desired to obtain possession of this money so that it might be properly invested, and, accordingly, accompanied by her daughter Lillian, she visited her farm and had an interview with her husband in regard to the check. The testimony of the husband on this subject is as follows:

"Q. What happened on the twenty-third of December [1912]?

"A. Then I signed the check.

"Q. Tell us what happened, just the whole story?

"A. Well, my wife and Lillie came to the house in the afternoon or evening of the twenty-third; they had got a conveyance and came over as far as the Old Tuttle's corners, and then Lillie came up to my place and got the horse and wagon and drove down and brought her mother up to the house, and I put up the horse, and then I went in, after we had had a little supper—you want me to go on and tell just the conversation?

"Q. Tell us the story.

"A. After we had had a little supper. my wife was sitting in front of the stove, and she said, 'Jim, what have you done with that check?' In our common conversation to each other. I said, 'Em, I have it.' 'Well,' she says to me, 'That has been drawn for some time and you have been losing the interest onto it, and now we have been paying the dividends on our life insurance and I wish now you would sign that and I will deposit that in the bank, the same as it is drawn, the same as the check is drawn. to our benefit, that is to James Shotwell and Emma Shotwell.' And she further said, 'Now, do you know, we been paying the dividends on this policy; we must not use any of the principal, but we must only use the interest of this money, and the proceeds of the farm must keep us. Now, don't let us get in debt, for we must keep our home.'

"Q. Well, what was the result of that conversation?

"A. Well, I signed the check.

"Q. Where was Lillie all this time?

"A. She was with her mother, set with her feet on the front of the stove, Lillie stood next to her, her mother set there with her feet on the front of the stove and Lillie stood next to her to the left, and I was to the right of her, on the chair on the right side of the stove."

This interview between Mrs. Shotwell and her husband occurred only twelve days after Mrs. Shotwell had given her instructions to the New York lawyer, and had her will drawn and executed all in the absence of her daughter Lillian, and now we find this same mother in the presence of her daughter arguing

with her husband and apparently dominating him in regard to the possession and investment of $2,250 in cash. After receiving this money from her husband the testatrix deposited the same in her own name in the Merchants National Bank of Newark. One draft of $50 was made on January 6th, 1913, and the rest of the fund with interest remained undisturbed until after the probate of the will. This transaction between Mrs. Shotwell and her husband does not, in my judgment, exhibit, or even suggest, a woman of feeble or vacillating mind whose testamentary purposes could readily be influenced by anyone. On the contrary, the transaction indicates that Mrs. Shotwell was, as the daughter says, a "very independent woman," fully capable of forming and carrying out her own plans and not liable to be unduly influenced by anyone.

In referring to the value of Mrs. Shotwell's estate, which the daughter Lillian takes under this will, I did not include the $2,200. It appears that the fund which now is held by the executrix amounts to about $1,700. Whether funeral expenses, &c., were paid out of the original $2,200 does not appear. The husband, James K. Shotwell, it seems, makes a claim to this fund, or a share of it, and perhaps in part founds such claim upon the promise which he says his wife made to him in regard to the way in which the money would be deposited. It was not necessary for the purposes of this case to consider the nature or enforceability of any claim to this fund on behalf of Mr. Shotwell, but the fact that the fund is an asset of the estate, if such be the fact, is a matter of some importance in determining, so far as we are obliged to determine, whether or not this was an inofficious will. It must be borne in mind that the will was made twelve days before this money was received by Mrs. Shotwell, that the check representing the money had to be endorsed by the husband as well as the wife, and that Mrs. Shotwell could not have been certain that she would be able to persuade her husband to place his endorsement on his check and hand it over to her for collection. Assuming, however, that Mrs. Shotwell contemplated that her daughter Lillian would not only get the farm, subject to her husband's right of courtesy, and the stock thereon, but also this insurance money, I am still of opinion that

Mrs. Shotwell's disposition of her little ·estate cannot be regarded as unjust. It is not uncommon for a parent to leave property to one child with the understanding that the gift is not a pure benefaction; that moral obligations go with it to render assistance to persons to· whom the testator deems it unsafe to make a testamentary gift. . Without regard to laws invalidating trusts of one kind or another, and making the enforcement of secret trusts a matter of difficulty, testators go on, and will go on, giving outright, without a sign of a trust, large holdings of property, real and personal, to A., a trusted son or daughter, for the purpose of enabling A. to take care of a parent or another son or daughter who is thus placed in a sort of secret *quasi*-guardianship. No law prevents a parent from enriching one son by a testamentary gift in order to put him in a position to take care of his surviving parent to whom no gift·whatever is made. If the· daughter Lillian carries out the wishes of her mother with respect to her father's support, and the father should live to reach an advanced age, she may spend all of this insurance money in the discharge of her filial obligations.

The evidence shows that down to the summer of 1913 the relations between the testatrix and both of these daughters were most affectionate. The letters from the testatrix to Laura, several of them written in the year 1912, show that the mother's heart was filled with love for the absent daughter. It is quite in accord with our common experience with human nature as manifested by a parent, that the absent child upon whom money and care has been expended, is better loved than the child who stays at home, gives his labor to his parent and between whom and the parent some friction, some petty quarrels are often inevitable.

While the affection of the testatrix for her daughter Lillian appears to have remained unbroken and probably increased as the mother's failing strength made the daughter's care more necessary, and perhaps more tender, something occurred which has not been explained by any evidence which in the summer of 1913 produced a certain estrangement between this mother and her daughter Laura. The mother and daughter had met on the farm, the one coming from North Arlington and the other coming from Chicago. They parted and Laura returned to her

home in Chicago, and, as she admits, never thereafter communicated with her mother in any way. No explanation of this unfilial conduct is suggested. When Laura was asked on the stand why for six months prior to her mother's death she had never written to her, she answered, "She did not write to me." Mrs. Lahey, a neighbor of Lillian, in North Arlington, became acquainted with the testatrix, Mrs. Shotwell, when she went to reside with Lillian, and testified to certain conversations she had with the testatrix. On one occasion Mrs. Lahey asked Mrs. Shotwell whether she could not go to her other daughter while Lillian was moving, and the testatrix replied:

"Well, my daughter Laura is in Chicago. I could not go to her * * * I have not heard from my daughter Laura in a long while, and I was a good mother to my daughter Laura and she was not. I don't care if I never see her."

It may be that Mrs. Lahey, who was a witness produced by the appellant, Lillian, somewhat intensifies the expression used by Mrs. Shotwell, but the evidence as a whole indicates beyond all doubt that the affectionate relations between the testatrix and her daughter Laura were greatly disturbed, if not severed, during the six months prior to the testatrix's death, and that this condition extended back to a time when there was no evidence that the testatrix was contemplating the making of any will. It does not appear that Mrs. Shotwell had ever made a will, or considered the matter of making a will, until the winter of 1912–13, when the will in question was executed. While Mrs. Shotwell no doubt felt aggrieved by the unfilial conduct of her daughter Laura, it does not appear that she was actuated by any feeling of resentment in disinheriting Laura and leaving all her property to Lillian. This is not, however, a case of disinheritance, because Laura in her education and qualification to practice medicine in Chicago, in which work she appears to have been successfully engaged when the will was made, had already received an "advance" far beyond the whole value of the property which her mother had to leave. Mr. Burr, the witness above mentioned, was asked on the stand whether Mrs. Shotwell stated to him "any reason for her making her will as she did," and he answered:

"Yes, she said her object in making the will was to leave what she had to one who deserved it; that the elder daughter had always given to her and helped her in every way, and the other daughter had never done anything except take from her; that the elder had been of no expense in the way of education but that the younger daughter had, and it was all summed up in that way that she was giving it where it belonged, to the one that deserved it or to the one that was entitled to it."

In addition to recompensing Lillian, Mrs. Shotwell, as we have seen, also contemplated that Lillian would take care of her father to the extent necessary either at the farm or elsewhere, and that to accomplish such purpose she would probably require and ought to have vested in her whatever property she (Mrs. Shotwell) had to leave at her death. Lillian, in her testimony, distinctly admits that her mother considered that she (Lillian) would naturally and properly look after her father, and Lillian makes no denial that such moral obligation rests upon her, but states that when in January, 1913, she first learned the contents of the will she said: "Mother, I think you have put a big responsibility on my shoulder."

In giving due weight to the fact that the will was executed while the mother was residing at least temporarily with her daughter Lillian in North Arlington, and that Lillian aided her mother in finding a lawyer to draw her will and accompanied her mother to this lawyer's office for the purpose of having the will drawn and executed, it must be borne in mind that the daughter Laura was not excluded from her mother's presence or society. If Laura saw her mother for the last time at the farm in Sussex county in September, 1913, and had no correspondence with her mother after that time, there is no evidence to show that Lillian was responsible for such an unhappy state of affairs. The evidence of Laura indicating that while at the farm in the summer of 1913 she was prevented from having unrestricted intercourse and private intercourse if she so desired with her mother, by some management on the part of Lillian, is, in my judgment, of very little weight. Laura's testimony is denied by Lillian, and, in my opinion, is probably exaggerated and as it stands is improbable.

From the summer of 1913 until her death it is plain that Mrs. Shotwell's natural and proper home was with her daughter Lil-

lian. The mother no longer could do the hard work of the farm house, and she needed the care of a daughter, and Lillian, who appears to have been something of a business woman and had at times acquired property, had a business in North Arlington to take care of—a shop to tend. Her mother naturally went to the daughter, as the daughter could not come to the mother and live on the farm as she had done in former years. The mother, however, was not under any constraint from the daughter, nor were her relatives or other persons prevented from seeing her. The testimony shows that Mrs. Shotwell went back and forth between the farm and North Arlington during the summer and fall of 1913, although her physical condition appears to have made it proper, if not absolutely necessary, that her daughter Lillian or some other companion should accompany her when she made any journey away from her home.

A decree will be advised reversing the decree of the Sussex orphans court and establishing the validity of Mrs. Shotwell's will.

The decree of the orphans court will not be disturbed so far as it allows counsel fees and costs to the appellant in that court, the respondent in this court. Counsel for the respondent below, the appellant in this court, admits that he consented to the allowance of these counsel fees to his adversaries, but claims that his consent did not cover the allowance of costs. It appears, however, from his statement that the draft of the decree in its present form was exhibited to him and that he made no objection to the allowance of costs therein made, and made no move to prevent the decree from being carried out and the checks of the administrator *pendente lite* from being paid out of the funds of the estate as provided in the decree. The application of counsel for respondent in this court for a counsel fee and costs will be denied.

No application was made to charge the respondent in this court with costs either in the court below or in this court, and the propriety of such a possible charge has therefore received no consideration, nor is any intimation made in regard to the matter.